[Cite as *Manshadi v. Bleggi*, 2021-Ohio-3593.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

JAVAD D. MANSHADI, M.D., et al.,

Plaintiffs-Appellants,

v.

ALBERT BLEGGI, M.D., et al.,

Defendants-Appellees.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 20 MA 0066**

---

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2016 CV 320

**BEFORE:**
Cheryl L. Waite, Carol Ann Robb, Judges and Judge Mary Jane Trapp, Judge of the
Eleventh District Court of Appeals, Sitting by Assignment.

---

**JUDGMENT:**
Vacated.
Reversed and Remanded.

---

*Atty. Stephen P. Hanudel*, 124 Middle Avenue, Suite 900, Elyria, Ohio 44035, for
Plaintiffs-Appellants

*Atty. Richard G. Zellers*, 3695 Boardman Canfield Road, Bldg. B, Suite 300, Canfield, Ohio 44406, for Defendants-Appellees.

Dated: September 29, 2021

_____

**WAITE, J.**

{¶1} Appellants appeal the June 5, 2020, judgment entry of the Mahoning County Court of Common Pleas granting Appellees' motion to dismiss following our limited order of remand. Appellants correctly assert that the trial court failed to address the outstanding questions as to Appellants' conversion claim that were remanded and the trial court erred when it dismissed the matter without following the instructions on remand. For the following reasons, the June 5, 2020 judgment entry is vacated and the matter is once again remanded to the trial court for proceedings consistent with this holding and our Opinion in *Manshadi v. Bleggi,* 2019-Ohio-1228, 134 N.E.3d 695 ("*Manshadi I*").

Factual and Procedural History

{¶2} The following facts are derived from the record as set forth in *Manshadi I.*

On or about September 15, 1997, Appellee, Albert Bleggi ("Bleggi"), a physician, formed Medical Imaging Network, Inc. ("MIN"). Bleggi was the sole shareholder of MIN and MIN is also an Appellee. Appellees owned radiology equipment and operated a radiology practice. On June 20, 2005, MIN filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Northern District of Ohio. On August 17, 2005, Bleggi filed for bankruptcy protection in the same jurisdiction. On January 30, 2006, Lyon Financial Services, Inc. ("Lyon"), a secured creditor in

Bleggi's bankruptcy, filed a complaint in the bankruptcy court objecting to Bleggi's request for a discharge of his debts in his Chapter 7 bankruptcy.

On May 4, 2007, the parties in MIN's bankruptcy filed a joint Chapter 11 plan of liquidation. In this plan, Lyon, Bleggi and MIN agreed that Bleggi would form a new entity to which Lyon would lend approximately $3.2 million dollars in exchange for a cognovit note guaranteed by Bleggi. On May 27, 2007, Bleggi formed Medical Imaging Diagnostics, LLC ("MID") as a single member limited liability company, with Bleggi as the sole member. After MIN's Chapter 11 plan was confirmed, Lyon and Bleggi reached an agreement to dismiss Lyon's complaint against Bleggi's bankruptcy filing, because Lyon was to receive its relief through operation of the MIN Chapter 11 plan.

Sometime in early 2008, Bleggi and MID defaulted on the Lyon cognovit note. On April 2, 2008, Lyon sued Bleggi, Bleggi's wife, his realty company and MID in Mahoning County Common Pleas Court for default on the cognovit note. (Mahoning County Case No. 08CV1376). Lyon obtained judgment on the note on April 7, 2008.

On June 4, 2008, Lyon filed a motion asking that a receiver be appointed over MID. This receiver was appointed on June 16, 2008. On November 7, 2008, the trial court ordered the sale of all of MID's assets. In late 2008 or early 2009 Appellant Javad Manshadi ("Manshadi"), learned of the opportunity to purchase MID's assets through his father-in-law, George

Alexander. Alexander was a long-time friend of Bleggi. On March 12, 2009, Manshadi formed Galexco, LLC, a single member limited liability company with Manshadi as the only member, for the sole purpose of purchasing MID's assets (Manshadi and Galexco are hereinafter referred to collectively as "Appellants"). On April 2, 2009, Galexco entered an appearance in the trial court as a potential buyer of MID's assets. On August 31, 2009, Galexco was approved for a Small Business Administration ("SBA") loan from Excel National Bank ("Excel") for $1.18 million in order to purchase MID's assets. Manshadi executed a personal guarantee on the loan.

On October 2, 2009, the court approved an agreed order for the sale of MID's assets to Galexco for $1.3 million. Galexco purchased all rights, title and interest in MID's assets, including tangibles and certain intangibles. This included radiology equipment, x-ray machines, MRI machines and CT scan machines which had been owned by MID. The terms provided that Galexco advance $75,000 to the receiver and then pay $1.225 million directly to Lyon. The $1.225 million to Lyon was to satisfy the judgment against Bleggi. On January 8, 2010, Galexco tendered payment according to the terms of this agreement and the court approved the final distribution and closed the case.

* * * Manshadi contends that in early 2010, the parties agreed that Galexco would maintain ownership of the equipment, but that MID would be permitted to utilize this equipment to operate MID's Boardman and Liberty

locations, where the equipment had remained ever since it was purchased by Appellees. Manshadi contends that in the oral agreement with Appellees, in exchange for use of the equipment, Appellees agreed to pay Appellants a one-time sum of $350,000. According to the terms of Manshadi's SBA loan with Excel, Galexco was required to maintain ownership of the equipment. Also according to the terms of the SBA loan, however, Galexco was required to operate the equipment and bill insurance providers under its own medical provider identification number and maintain insurance on the subject equipment. Manshadi alleges that the parties agreed that their arrangement allowing MID to operate was intended to last less than a year, because the parties were looking for a buyer of Appellees' practice and were hoping it would sell within that time. Further, Manshadi asserts that Appellees agreed to pay the monthly payment that Manshadi owed to Excel on the SBA loan, and in exchange Appellees would keep all other profits from the radiology practice. Manshadi admits that shortly after entering into the oral agreement, Bleggi informed him that he would not be able to secure the funds necessary to make the one-time lump sum payment. Hence, Appellees began making additional monthly payments of between $3,000 to $4,000 per month, commencing sometime in early 2010. These payments continued for approximately three years. MID continued to pay the monthly Excel SBA loan payment for approximately one year. The record contains no copies of cancelled checks or other evidence in support of the amount or duration of any of these payments.

The parties attempted to find a buyer for Appellees' practice and engaged in negotiations with St. Elizabeth's Hospital for a short time, but a sale of the practice was never achieved. On April 11, 2013, Excel notified Galexco that it was in default on the loan, because services utilizing the equipment were being provided under MID's provider number, rather than a provider number obtained by Galexco. Manshadi contends that he had been telling Bleggi that he needed his own provider number, but that Bleggi had dissuaded him, assuring him the practice would be sold in the intervening time period.

Since Galexco had not insured the equipment, on April 12, 2013, Appellees obtained two Travelers Insurance policies covering the Galexco equipment: the first was a commercial general liability policy and a business owner policy, naming Galexco as an additional insured. The second policy was only in MID's name but was to insure the equipment owned by Galexco.

Manshadi contends that he met with his attorney, who had been representing him throughout his dealings with Appellees, on May 16, 2013 to discuss the technical default issue and that Bleggi was present. We note that the record reflects this attorney was a long-time friend of Bleggi's. Bleggi contends he was not present for any such discussions regarding technical default on the loan. Manshadi alleges that his lawyer and Bleggi urged him to sign a document transferring 50% ownership of Galexco to Bleggi, as well as giving Bleggi the power to cast any tie-breaking vote in

Galexco. Manshadi contends he was told by both that this would result in making Bleggi liable for one-half of the Excel loan and would solve the technical default issue. Manshadi claims his lawyer told him the lawyer had spoken with Excel and received approval for the transaction. On this basis, Manshadi contends he signed a document transferring ownership. No such document was ever produced and is not a part of the record. However, Manshadi claims he contacted Excel after the transfer of Galexco to confirm what had transpired. Excel indicated that it did not approve the transaction and that any change in management of Galexco without prior approval would result in violation of the loan agreement.

Manshadi contends that a short time later, Bleggi stopped making monthly payments on both the outstanding $350,000 lump sum debt and on the monthly Excel loan payment. Manshadi also alleges that Bleggi assumed control of Galexco's financial documents and prevented Manshadi from having access to any of Galexco's records. Manshadi says he attempted to obtain the records by going to MIN's Boardman location but that Bleggi refused access and called the police to escort Manshadi off of the property. On June 18, 2013, Manshadi sent an email to his lawyer and to Bleggi stating that he was voiding the controlling interest agreement he had signed. There was no response to the email.

On July 8, 2013, Manshadi, in his individual capacity, filed an action against Bleggi, MID, and Galexco for refusal to allow Manshadi access to records

and for conversion, fraud, and breach of contract. (Mahoning County Case No. 13CV1822).

On September 10, 2013, Excel sent Galexco, via Manshadi, a notice of default on the loan and a demand for full payment of the principal balance. The total amount due at the time was $838,357.65.

In this 2013 action, Manshadi filed for a temporary restraining order seeking to enjoin Appellees from dissipating, hiding, or compromising the assets of Galexco while the matter was pending. A hearing was held on the temporary restraining order on September 19, 2013. Several individuals testified, including both Bleggi and Manshadi. Transcripts from the hearing in that action have been filed in this matter and are part of the record for review. During his testimony, Bleggi admitted that he had been paying the Excel loan monthly stating, "[t]he agreement with me and Galexco is to make sure the bank note gets paid for the equipment." (9/19/13 Tr., p. 190.) Regarding the lump sum payment from MID to Galexco, Bleggi testified, "$300,000 we agreed to pay him." (9/19/13 Tr., p. 200.) Bleggi testified that there was no written document for this agreement and "[h]e's been paid 165- so far, so he's owed another 135,000. And I've kept up my word. That's 300,000." (9/19/13 Tr., p. 201.) Bleggi also answered in the affirmative when asked if he was required to pay the Excel loan and whether it was delinquent at that time. (9/19/13 Tr., p. 201.)

While these matters were pending, due to below normal temperatures in January of 2014, water pipes froze and ruptured at MIN's Boardman location where some of Galexco's equipment was located. Shortly afterward, Appellees submitted a claim to Travelers, alleging the subject equipment suffered total damage and loss due to the flooding. Over the next several months, Travelers made several payments to Appellees pursuant to its policies of insurance, totaling over $1 million.

On July 23, 2014, Excel entered into a voluntary surrender and release (VSRA) Article 9 sale agreement with Appellees. The VSRA acknowledged that Appellants owned the equipment in which Excel had a security interest, that Appellants were in default, and that $875,000 remained due and owing on the loan. Despite this, Appellants were never made a party to the agreement. The VSRA also acknowledged that Appellees had obtained insurance on the subject equipment and that Travelers had issued two checks made payable to MID and Excel in the amounts of $610,216.32 and $34,619.60 for equipment damage or loss. The VSRA further indicated that MID was in possession and control of the secured assets and that MID intended to purchase the assets from Excel in a private sale pursuant to R.C. 1309.101. Finally, the VSRA had as an attachment an exhibit listing all of the Galexco equipment in which Excel had a secured interest, totaling $465,000. This exhibit does not separate or separately value undamaged equipment from the Liberty location from damaged equipment located in Boardman. It also does not include any equipment owned by MID or any

specific valuations of this property. This exhibit also stated that MID was to retain the remaining $179,835.92 of the insurance proceeds to cover the loss of equipment owned by MID which was damaged or destroyed when the pipes burst. The VSRA provided Excel's release to Appellees from further liability, but specifically stated that Excel was preserving its deficiency claims against Appellants. The VSRA was executed by Excel and Appellees.

Due to issues with substitution of counsel and the requirement of additional time to prepare for trial, on September 10, 2014 Manshadi filed a notice dismissing the 2013 lawsuit without prejudice pursuant to Civ.R. 41(A).

On January 29, 2016, Manshadi filed the instant suit, alleging similar claims of fraud, conversion, and breach of contract. This suit was filed by him, individually, and on behalf of Galexco. In this suit, Appellants requested a declaratory judgment that Manshadi be deemed the sole owner of Galexco and an order that the May 2013 transfer agreement be invalidated. On January 29, 2016, Appellants filed a motion for a restraining order in this action, again seeking to enjoin Appellees from disposing of any assets, including, money and property that allegedly belonging [sic] to Galexco. On March 3, 2016, Appellees filed a motion to dismiss and for sanctions. They alleged that the one-year saving statute, R.C. 2305.19, had run in this matter, barring Appellants from raising these claims. As Bleggi alleged that his counsel informed counsel for Manshadi that the savings statute no

longer applied prior to refiling, sanctions were sought. Manshadi contended that because his breach of contract claim had a six or eight year statute of limitations, the savings statute did not apply and as the claims were refiled within this statute of limitations the case should not be dismissed. In a judgment entry dated July 7, 2016, the trial court denied the motion to dismiss.

On June 30, 2017, Appellants filed a motion for summary judgment seeking judgment for damages against all defendants jointly and severally in the amount of $457,000 and for the court to find that Bleggi had no interest in Galexco because Galexco was wholly owned by Manshadi. Several exhibits were attached, including: (1) an affidavit from Manshadi setting forth evidence of his ownership in Galexco; (2) a copy of the VSRA between Appellees and Excel with the itemized list of the equipment subject to the VSRA; (3) a statement of loss issued by Travelers Insurance reflecting insurance payments made to MID and a schedule of the equipment subject to the insurance payments; (4) a spreadsheet listing of all the equipment that was owned by Appellees; (5) a notification of disposition of collateral sent to Appellants from Excel, showing that the subject equipment was scheduled to be sold at a private sale; (6) a secured party bill of sale from Excel to MID, reflecting that MID purchased all of Galexco's equipment for $465,000 pursuant to R.C. 1309.101; (7) a copy of the endorsed check from Travelers Insurance to MID and Excel in the amount of $610,216.32; (8) a copy of the personal guarantee executed by Manshadi for the Excel SBA

loan in 2009; (9) a copy of the loan agreement executed by Manshadi, acting on behalf of Galexco, and Excel in 2009; (10) a copy of the note for the Galexco SBA loan; (11) a copy of the security agreement between Excel and Galexco with an attached schedule of the collateralized equipment; (12) a copy of the standby creditor's agreement listing Bleggi, individually, as the standby creditor and Galexco as the standby borrower; (13) a promissory note executed by Galexco to Bleggi, individually, for $155,000 for the first balloon payment on the subject equipment; (14) a statement of the Excel SBA loan showing payments made on the loan from September 2009 through December of 2014, including the lump sum payment from the private purchase by MID, and having an outstanding balance of $363,123.81; (15) articles of organization for Galexco filed with the Ohio Secretary of State in 2009; and (16) a copy of the agreed order approving the sale of the Galexco equipment from the receiver to Appellees.

On July 26, 2017, Appellees also filed a motion for summary judgment. In their motion they argued that they were entitled to judgment for several reasons. First, they argued Counts 2 and 3 of the complaint, which raised claims for conversion and fraud in the transfer of Galexco's ownership, were moot. They argued that since there was never any transfer of Galexco stock, there was never a document produced to evidence that Manshadi signed over 50% ownership. They also argued that Manshadi's tax returns showed him as the sole owner of Galexco, retaining all of Galexco's profits and losses.

Case No. 20 MA 0066

Next, Appellees claimed that Count 1, alleging the conversion of the medical equipment, was not supported by the facts as alleged by Manshadi. Appellees proceeded to outline multiple facts which allegedly showed that Bleggi never received any proceeds relative to Galexco equipment. Appellees claimed that neither Manshadi nor Galexco ever obtained insurance on the subject equipment as required by the Excel loan, so Appellants were in breach of their loan agreement from the beginning. Ultimately, Appellees obtained this insurance. Payments made by Travelers for the damaged Galexco equipment were negotiated between Travelers, counsel for MID and Excel. The burst water pipe damaged both Galexco and MID property: all of this property was covered by Travelers Insurance. Excel received payment from Travelers for the damaged Galexco equipment. The value for that equipment was determined by the insurance adjusters and Excel. Since the loan agreement provided that Excel had a security interest in all of the equipment, Appellants had no remaining interest in the equipment once Excel asserted its rights as a secured creditor. Based on these alleged facts, Appellees suggested in their motion for summary judgment that Appellants should seek recourse against Excel, rather than Appellees, claiming that Appellants were informed of the pending sale of the collateral by Excel, which sent Appellants a notice of disposition of collateral, and that Excel rightfully exercised their claim over the collateral pursuant to the VSRA agreement.

Case No. 20 MA 0066

Regarding Count 4 of the complaint, alleging breach of contract, Appellees argued that any contract that existed between the parties was oral, and admittedly consisted of payments made by MID to Galexco on a monthly basis over several years as opposed to a one-time lump sum payment. Pursuant to R.C. 2305.07, an action on an oral contract must be brought within six years after the cause accrued. As the oral promise alleged by Manshadi began when payments were made in October or November of 2009 and their action was not filed until January 29, 2016, these claims are outside the statute of limitations.

Attached to Bleggi's motion was an affidavit stating that he did not remember signing any document transferring 50% ownership of Galexco and that he made several payments to Manshadi reflecting both profits from the business and for payment of the Excel loan. He averred that he never promised to pay $300,000 in a lump sum. He stated that he did not retain insurance proceeds from the subject equipment. A copy of the security agreement between Galexco and Excel was attached to the motion. Appellees also attached the statement of loss from Travelers Insurance and the notice of disposition of collateral from Excel to Appellants.

In a judgment entry dated January 23, 2018, the trial court overruled Appellants' motion and granted Appellees' summary judgment motion. The trial court reached the following conclusions based on the pleadings, documents filed and the transcript of the hearings held in the previous

action. Regarding the dispute over ownership of Galexco, the alleged transaction transferring 50% ownership never took place, and all claims in this regard were moot.

Regarding the conversion of the medical equipment claims, the trial court found that Appellants were seeking $179,825.92 of the insurance proceeds, claiming Appellees improperly kept that amount when it should have gone to Excel as the secured creditor, in payment on the equipment. The trial court held that because Appellants never obtained insurance on the equipment, they had no claim to any of the insurance proceeds. Moreover, Appellees bought and owned certain equipment insured with Travelers that was also damaged and Appellees were paid only for this equipment from the insurance proceeds. Regarding Galexco's equipment, the court found that it was appraised and its value adjusted, and Excel was paid for the value of this equipment as the secured creditor of the loan between Galexco and Excel because the loan was in default. Appellants were given notice that Excel was disposing of the remaining viable Galexco equipment by selling it to MID, and so given an opportunity to object or request a specific accounting, but did not. Hence, Galexco waived that right. As Appellants are not entitled to recover any of the insurance proceeds, they were unable to recover on their conversion claims.

Regarding breach of contract claims, Appellants failed to produce a written contract demonstrating the alleged 50% transfer of ownership of Galexco

to Bleggi, and the record did not show that such transfer ever took place. As to the alleged agreement to pay Appellants either $350,000 or $300,000, the trial court also concluded that any contract for payment that is not to be performed within one year must be in writing pursuant to R.C. 1335.05. Appellants acknowledged in their motion for summary judgment that a lump sum payment was not made. Instead, payments were made by Appellees at the rate of $3,000 to $4,000 per month beginning in 2009 with the agreement of Appellants. The complaint in the action was filed January 29, 2016. Any promise to pay, according to Appellants' own motion for summary judgment, began in October or November of 2009. As there was no one-time payment but a series of installments that continued over several years, in the absence of a written contract Appellants were precluded from bringing this breach of contract claim by the statute of frauds.

*Manshadi I,* ¶ 3-27.

{¶3}   Appellants appealed the 2018 order (*Manshadi I*). They argued the trial court erred in granting Appellees' motion for summary judgment on their claims of conversion and breach of contract. We determined that, although the Appellants brought a common law claim of conversion, all of the medical equipment at issue was used as collateral for Appellants' SBA loan and that Excel, as the holder of the loan, had taken a security interest in the equipment as a secured creditor. Thus, we held that any disposition of the collateralized equipment by Excel fell under the strict notice requirements for secured transactions pursuant to Section 9-611 of the Uniform

Case No. 20 MA 0066

Commercial Code (UCC), codified in Ohio as R.C. 1309.611. *Id.* at ¶ 38. Pursuant to R.C. 1309.611, Excel was required to "send a reasonable authenticated notification of disposition" to Appellants prior to the sale in order to give Appellants the opportunity to request an accounting of the collateral. We further held that the notification sent to Appellants by Excel listed the sale date for the collateral as "sometime after August 3, 2014" but that the sale of the collateral by Excel to Appellees, through an Article 9 voluntary surrender and release agreement ("VSRA"), was executed on July 23, 2014, rendering the notice invalid on its face. *Manshadi I,* ¶ 42. In addition to the invalid notice issue, we held the record was insufficient regarding key terms of the sale between Appellees and Excel. Specifically, (1) the record did not show that separate valuations were obtained and disclosed for the undamaged and damaged equipment; (2) the record contained no evidence of what Appellees paid for each of these separate groups of equipment; and (3) that the purchase by Appellees was made using the Travelers' insurance proceeds. Thus, we held:

> Reasonable minds could differ, after review of this record, on the issue of whether insurance proceeds due and owing solely for damaged equipment was instead converted by Appellees and used towards the purchase of other, undamaged Galexco equipment. Reasonable minds could differ as to whether the disposition of the equipment by Excel through a purported Article 9 sale to Appellees, who admit they had agreed to pay Appellants' loan with Excel and that the loan was allowed to default, amounted to a sale to a bona fide purchaser. Because these questions of fact exist there are

outstanding matters for trial in this matter and summary judgment was not appropriate with regard to Appellants' conversion claim.

*Manshadi I,* ¶ 42.

**{¶4}** As a result, we remanded the matter to the trial court, holding:

As genuine issues of material fact exist regarding the validity of the underlying Article 9 sale of all of the collateralized equipment, Appellant's first assignment of error has merit and is sustained.

* * *

Therefore, the judgment of the trial court is reversed only as it pertains to Count 1 of Appellants' complaint for conversion of the subject equipment. The remainder of the trial court's judgment is affirmed and the matter is remanded to the trial court for further proceedings according to law.

*Manshadi I,* ¶ 56-58.

**{¶5}** On remand, before any proceedings were held in the trial court, Appellees filed a motion to dismiss on February 25, 2020, asserting:

The Court of Appeals specifically took issue with the notice requirements finding that they were not complied with. Upon a review of the relevant law, it is the Defendants' position that they are not responsible for providing the Plaintiffs with notice prior to the disposition of collateral, but rather, it is the secured parties' responsibility to properly notify the Plaintiffs. The secured

party in this matter was Excel National Bank. They were the party who collected collateral from the Plaintiffs and Defendants to be disposed of due to a default in a loan agreement with them. It was Excel National Bank's responsibility to properly notify the Plaintiffs prior to the disposition of collateral which the Court of Appeals found that they did not; thus, remanding the case for further proceedings with this Honorable Court. Defendants, however, are not responsible for notification and thus are no longer liable in this matter. Thus, they are requesting their dismissal from the suit as this matter is to be litigated solely between the Plaintiffs and Excel National Bank.

(2/25/20 Motion to Dismiss.)

{¶6} On March 10, 2020, Appellants filed a response arguing that Appellees misinterpreted our opinion in *Manshadi I.* Specifically, Appellants argued that Appellees ignored a portion of our holding in that we not only held that Excel's notice was not reasonable and was invalid on its face, but, also, that a genuine issue of material fact existed as to whether Appellants were bona fide purchasers of the medical equipment at issue.

{¶7} On June 5, 2020, the trial court issued a short judgment entry, stating:

Upon review and consideration of the matter, and for good cause shown, Defendants [sic] Motion to Dismiss is sustained. Claims remaining in Plaintiffs [sic] Complaint against Defendants are dismissed with prejudice. Costs taxed to Plaintiffs.

Case No. 20 MA 0066

(6/5/20 J.E.)

**{¶8}** Appellants filed this timely appeal.

<u>ASSIGNMENT OF ERROR</u>

THE TRIAL COURT ERRED BY GRANTING APPELLEES' MOTION TO DISMISS.

**{¶9}** Appellants argue the trial court improperly dismissed this matter on remand from our holding in *Manshadi I.* From the cursory fashion that both Appellees' motion to dismiss and the trial court's judgment entry granting the dismissal were drafted, it is not clear whether the matter was dismissed pursuant to Civ.R. 12(B)(6) or on summary judgment. Nevertheless, the record is clear that this matter is not ripe for dismissal under either standard. Pursuant to the law-of-the-case doctrine, a trial court lacks the authority to extend or vary the mandate issued by a superior court. As this issue presents a question of law we must apply a de novo review standard. *Arnott v. Arnott,* 132 Ohio St.3d 401, 2012-Ohio-3208, 972 N.E.2d 586, ¶ 17.

**{¶10}** The law-of-the-case doctrine has long existed in Ohio jurisprudence and provides that, "the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." *Hopkins v. Dyer,* 104 Ohio St.3d 461, 2004-Ohio-6769, 820 N.E.2d 329, ¶ 15, quoting, *Nolan v. Nolan,* 11 Ohio St.3d 1, 3, 432 N.E.2d 410 (1984). The purpose of the doctrine is to ensure the consistency of results in a case, to avoid endless litigation by settling issues and also to preserve the integrity of superior and inferior courts set forth in the Ohio Constitution. *Id.*

<u>Case No. 20 MA 0066</u>

**{¶11}** The law-of-the-case doctrine is generally considered "a rule of practice rather than a binding rule of substantive law[.]" *Nolan,* at 3. The Ohio Supreme Court has explained that the Ohio Constitution "does not grant to a court of common pleas jurisdiction to review a prior mandate of a court of appeals." *State ex rel. Potain v. Mathews,* 59 Ohio St.2d 29, 32, 391 N.E.2d 343 (1979). The doctrine ensures that trial courts follow the mandates of the reviewing court. *Nolan* at 3. Moreover, "[a]bsent extraordinary circumstances, such as an intervening decision by the Supreme Court, an inferior court has no discretion to disregard the mandate of a superior court in a prior appeal in the same case." *Id.,* syllabus. Thus, a trial court does not have the authority to extend or vary the mandate issued by a reviewing court. *Id.* at 4. "[W]here at a rehearing following remand a trial court is confronted with substantially the same facts and issues as were involved in the prior appeal, the court is bound to adhere to the appellate court's determination of the applicable law." *Id.* at 3.

**{¶12}** In *Manshadi I,* we held both that Excel's notice of disposition of the collateral was invalid on its face and, in addition, that a number of questions of fact still remained regarding Appellants' claim for conversion. Specifically, that the record was factually insufficient to support a valid sale of the collateral. Key terms and conditions of the sale were absent from the record including itemized valuations of both the damaged and undamaged property; itemized purchase prices for both the damaged and undamaged equipment and the specific source of the proceeds used to purchase both the damaged and undamaged equipment. We held that, in addition to the invalid notice and the effect that may have on the outstanding issues in this case, several questions of fact must be resolved. As a result, Appellants' conversion claim remained outstanding. Those same

Case No. 20 MA 0066

questions of fact remain unresolved. Without any further proceedings or the introduction of any additional evidence into the record, the trial court on remand was presented with the identical factual record as it had prior to our decision in *Manshadi I.* Hence, dismissal of the matter, whether by summary judgment or utilizing Civ.R. 12(B)(6), is improper based on this record.

{¶13} We remanded the matter in *Manshadi I* holding, "the judgment of the trial court is reversed only as it pertains to Count 1 of Appellants' complaint for conversion of the subject equipment. The remainder of the trial court's judgment is affirmed and the matter is remanded to the trial court for further proceedings according to law." *Manshadi,* ¶ 56, 58. Contrary to Appellees' assertion, we did not solely determine that Excel's notice of the sale was invalid. We specifically reversed the trial court's summary judgment decision on the conversion claim. We were clear in *Manshadi I* that the trial court erred in granting summary judgment because the notice of the sale was invalid, this had an effect on all subsequent actions of the parties, and that factual questions remained regarding the sale and whether Appellees were bona fide purchasers. Appellants' claim for conversion remained outstanding as a result.

{¶14} On remand, no proceedings in aid of resolution were held nor did either party introduce any additional evidence into the record, meaning the trial court was confronted with the same facts and issues with which it was confronted prior to appeal. Hence, the issues are identical to those presented to us in the first appeal where we held the conversion claim could not be dismissed through summary judgment. Since the matter had once been determined in summary judgment and we reversed, finding that questions of fact remained did not allow determination of the issues as a matter of law, it

is axiomatic that the matter could not be dismissed for failing to state a claim pursuant to Civ.R. 12(B)(6). Under the law of the case doctrine, the trial court was required to adhere to our determination of the applicable law. *Giancola v. Azem,* 153 Ohio St.3d 594, 2018-Ohio-1694, 109 N.E.3d 1194, ¶ 16. Further proceedings are required to resolve any and all outstanding questions of fact as to whether the sale was valid and ownership of the equipment properly transferred to Appellees via the Article 9 sale.

**{¶15}** For the reasons stated above, Appellants' assignment of error has merit and the judgment of the trial court is reversed. The matter is once again remanded for proceedings consistent with this holding and the Court's holding in *Manshadi I*.

Robb, J., concurs.

Trapp, J., concurs.

Case No. 20 MA 0066

For the reasons stated in the Opinion rendered herein, the assignment of error is sustained and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is reversed.  We hereby remand this matter to the trial court for further proceedings according to law and consistent with this Court's Opinion.  Costs to be taxed against the Appellee.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

**<u>NOTICE TO COUNSEL</u>**

**This document constitutes a final judgment entry.**